JAMES K. ALLEN, Assessor *v.*
DEPARTMENT OF REVENUE,
BLUE MT. FOREST PRODUCTS, INC.,
*Intervenor*

Claud B. Ingram, John Day, represented plaintiff.

Robert B. Abrams, Heppner, represented intervenor.

Defendant Department of Revenue made no appearance.

Decision for plaintiff rendered February 9, 1973.

CARLISLE B. ROBERTS, Judge.

Pursuant to ORS 306.545, the County Assessor of Grant County, Oregon, appealed from the Department of Revenue's Order No. VL 71-589 which granted a property tax exemption to a sawmill on the ground that the mill was a commercial facility under construc-

tion and therefore exempt from ad valorem taxation pursuant to ORS 307.330, on January 1, 1971. Blue Mt. Forest Products, Inc., was and is the owner of the subject property; it intervened in accordance with ORS 306.545 (3).

The application of ORS 307.330 to the subject property was disputed; the facts themselves are relatively clear. In 1970, the stockholders of the Heppner Lumber Company created a new corporation, the intervenor. The general manager of the Heppner mill, an experienced mill operator, was made general manager of the new enterprise with instructions to establish and operate a stud mill on a leased site of a former lumber mill at Long Creek. This site was chosen, among other reasons, because it contained a wigwam burner in good condition, unused during the past four years. The management was aware that wigwam burners were being phased out under the law administered by the Oregon Department of Environmental Quality but believed that the burner was eligible for continued use under a "grandfather clause." The proposed mill was under construction in the summer of 1970, utilizing all new equipment, but with a plan which relied upon the disposal of waste (other than chips) in the burner. However, DEQ forbade the use of the burner and the intervenor employed sawmill engineers to develop a system for carrying the sawdust and chips from the operating area into bunkers. As part of its program, the mill expected to utilize a substantial quantity of dead timber and snags ("buckskins"). These produce substantially more waste than green logs. Accordingly, the general manager instructed the contracting engineers to visit two other specified mills which were

handling the same type of logs, to study their waste disposal requirements as to quantity and to construct the necessary apparatus to dispose of the sawdust and chips without a burner.

Beginning in July 1970, the new conveyors were torn out of the burner and rerouted. A start-up was made in September 1970, with the thought that the waste-disposal system was complete, but trouble immediately developed. It is understood that sawdust and chips (the latter term including slabs, broken boards, cut-offs and other wastes which can be turned into wood chips) cannot be allowed to accumulate in the sawmill's cutting and working area. The amount of waste accumulated in three or four minutes without proper disposal will require the shutdown of the machinery until the jam or stoppage is eliminated. With each halt, the mill crew would turn to the elimination of stoppages and seek to make such alterations as appeared necessary to obtain a smooth flow of material. Only about two days' production was accomplished in September. During October, November and the first week of December 1970, the mill produced about one-fourth of its intended (and subsequent) capacity. Because of the problem, the mill engineers were called in for consultation on a number of occasions. By mid-December 1970, it was determined that failures inherent in the design of the chipper, conveyors and blowers could not be remedied on the site. The mill was closed down during most of December 1970-January 1971 while certain machinery was taken to Salem, Oregon, for redesign and rebuilding.

During the whole of this period, the building sheltering the machinery was not fully completed inasmuch as a good deal of the siding, necessary for the protection of the equipment and workers, had not been

installed. A barker was in position but it was not wired or plumbed. A scrag mill was left incomplete while more fundamental requirements of the mill received attention. It appears that an economically successful operation started with the installation of the redesigned machinery about March 1971.

It is admitted by the intervenor that on or before December 31, 1970, the mill was basically complete as to required foundations and essential machinery for turning out studs, that it had on hand a large supply of dry, barked logs, that it intended and expected to operate as an economic unit and, using a full crew, had actually produced and sold lumber, sawdust and chips in substantial quantities.

It was the assessor's belief that all tax exemptions must be strictly construed and that the taxpayer's property did not come within the exemption provided by ORS 307.330 because the mill was in use and operating before January 1, 1971. The intervenor agreed that about 1,007,000 board feet of lumber had been milled and sold in 1970. The plaintiff pointed out that no mill reaches peak efficiency at the start, that perhaps the management made a poor selection of machinery or the machinery was poorly designed by the manufacturer. The plaintiff's argument was summed up thus:

"* * * the machinery would work and to say that someone can operate or start up a mill and test it for three months and then shut it down and say they haven't used it is a misnomer * * *. Maybe not at peak efficiency because it wouldn't operate at that, but it was still being used."

The testimony proves that the basic elements of a sawmill had been assembled, under the direction of

experienced sawmill engineers, and production of studs was achieved from October to December 1970. Construction, as planned, had been substantially completed. A witness, Mr. Steve Ensign, an appraiser for the Department of Revenue, who had spent a day and a half appraising the operation while it was in production, testified to the "use and occupancy" of the mill in November 1970. He observed no repair work and no breakdowns, but recalled a fairly smooth operation and the production of lumber. (This witness had appraised 20 or 30 other stud mills and had worked in sawmills.)

Experienced laborers testified that the mill had a great deal of operating trouble but they considered themselves as laborers in a sawmill, not as construction workers. They agreed that the mill wasn't working efficiently but it was working.

ORS 307.330 provides that a new structure is exempt from taxation for each year of not more than two consecutive years if each of the following requirements is met; i.e., the structure:

"(a) Is in the process of construction on January 1;

"(b) Is not in use or occupancy on January 1;

"(c) Has not been in use or occupancy at any time prior to such January 1 date;

"(d) Is being constructed in furtherance of the production of income; * * *."

The defendant's pertinent administrative rule as of January 1, 1971, OAR 150-307.330 (2)(d) stated:

"* * * Use or occupancy refers to that use or occupancy for which the building is intended upon completion. * * * Testing of equipment preparatory to operation is allowable during the period of construction. * * *"

Defendant's Order No. VL 71-589, from which this appeal is taken, made a determination in favor of the intervenor on a finding that as of January 1, 1971, the mill was operating "for testing purposes only."

■ Although the intervenor's difficulties in getting its mill into profitable production enlists the sympathy of all altruists, this is not enough. As the plaintiff has contended, the assessor is entitled to rely upon the long-standing rule that tax exemptions are strictly construed. *Emanuel Lutheran Char. v. Dept. of Rev.*, 4 OTR 410 (1971), *aff'd*, 263 Or 287, 502 P2d 251 (1972). Upon careful consideration of the facts presented in this case, the court concludes that the mill was not "in the process of construction on January 1 [1971]" within the legislative intent, but was "in use or occupancy" before that date.

The words of the statute, "process of construction," involve many differences in degree and must be construed. *Collier Carbon & Chemical Corp. v. Dept. of Rev.*, 5 OTR 1 (1972), *aff'd*, 263 Or 414, 502 P2d 595 (1972). The word "construction" means the "act or art of constructing" and is based upon "construct," meaning "to form by putting together parts; build; frame; devise." In the *Collier Carbon* case, *supra,* the court said (at 7):

"* * * The legislature, in using 'structure,' is deemed to have contemplated the situation in which a plant, designed for a very specific use and not adaptable for any other purpose, could be regarded as useless until the whole structure is basically operable. * * *"

The facts in that case are easily distinguishable from the present, inasmuch as *Collier Carbon,* with several elements of its structure completed, was not able to

turn a wheel until all the essential parts necessary to its process were completed and shielded from water vapor. The necessary testing could not lead to any economic production. In the present case, the sawmill was producing only about 25 percent of its optimum production, but it was producing. The fundamental operating requirements of a mill had been devised, put together, framed and built. Experience in operation and study by engineers led to the conclusion that one important element, the conveyance of sawdust and chips from the saws to the bunkers provided for them, required machinery of better design to make the mill an economically viable structure. The intervenor contended that this need, inter alia, brought the property within the exemption statute.

 In the *Collier Carbon* case, *supra,* a New York court is quoted, construing an "occupancy" statute, as follows, at 5:

"* * * The underlying test, in accordance with the intent of the statute, is whether the construction of the building has reached the point where an economically viable structure is in existence as of the critical cut-off date. * * *" (*Oakwood in Forest Hills, Inc. v. Tax Commission,* 30 NY App Div2d 863, 293 NYS2d 58, 60 (1968).)

But ORS 307.330 does not require "an economically viable structure." The intended structure must still be "in the process of construction" on the assessment date. In order to forestall abuse of the exemption, the interpreter of the statute is forced to conclude that the extent of the exempt construction must be limited to the basic functional and substantially necessary elements of the structure. The legislative intent was to subsidize partially a new enterprise for one or two tax periods but not to underwrite the venture to the

point of economic viability. As stated in the *Collier Carbon* case, *supra,* at 5-6:

"* * * Certainly the plaintiff in the present case could not avoid assessment as of January 1, 1969, by showing (as it did) that the blacktop paving required modification, that tile had not been laid in the company offices * * * and that the plant's electric sign, bearing the company's name, had not been erected. * * *"

Each case must be decided on its own facts. It is conceivable that in some instance it would be plain that the completion of the last amenity would be requisite to "use or occupancy." In this case, however, the process of construction had been completed, although the barker was not wired or plumbed and the scrag mill was not operable. A plant existed which could turn out the product for which the plant was designed, from available raw material, although with difficulty.

Defendant's order is set aside and the assessor shall place upon the assessment roll the property exempt under said order and the tax collector shall amend the tax roll to conform to the assessment roll for 1971-1972 with respect to subject property.