MULTNOMAH COUNTY *v.* DEPARTMENT OF
REVENUE
MIDLAND-ROSS CORP., *Intervenor*

Plaintiff appeared by and through Charles S.
Evans, County Counsel for Multnomah County, Port-
land.

Defendant appeared by and through Glen V. Sor-
ensen, Assistant Attorney General, Salem.

Intervenor appeared by and through George L.
Kirklin and John H. Doran, Dezendorf, Spears, Lu-
bersky & Campbell, Portland.

Decision for defendant rendered February 28, 1974.

CARLISLE B. ROBERTS, Judge.

Multnomah County, Oregon, a political subdivision,
through its Department of Assessment and Taxation,
appealed to this court from the defendant Department
of Revenue's Order No. VL 72-97, dated February 28,
1973, which held that the improvements in an indus-

trial plant complex located in Section 26 2N-1W, Tax Lot 25 (14141 N. Rivergate Boulevard), in the City of Portland, County of Multnomah, were exempt from ad valorem taxation as of January 1, 1970, pursuant to ORS 307.330 and 307.340. The property was owned by Midland-Ross Corporation, the intervenor herein.

ORS 307.330 provides a property tax exemption for commercial facilities under construction, not to exceed two consecutive years, if the building or structure:

"(a) Is in the process of construction on January 1;

"(b) Is not in use or occupancy on January 1;

"(c) Has not been in use or occupancy at any time prior to such January 1 date;

"(d) Is being constructed in furtherance of the production of income; * * *."

See *Collier Carbon v. Dept. of Rev.*, 5 OTR 1 (1972), *aff'd,* 263 Or 414, 502 P2d 595 (1972); *Allen v. Dept. of Rev.* [Blue Mt. Forest Products, Inc., Intervenor], 5 OTR 185 (1973).

The intervenor, in the mid-1960s, developed a technique for reducing iron oxide pellets to a pellet containing 95 percent metallic iron by a new process known as the gaseous reduction of iron oxide. The new method was developed and tested in a pilot plant constructed in intervenor's laboratory in Toledo, Ohio. Having established in the laboratory the feasibility of producing an iron pellet of the desired quality, construction was begun by the intervenor in February 1968 of a prototype plant in the Rivergate Industrial Park of Portland, Oregon.

Application for exemption under ORS 307.330 for the tax year 1969-1970 was approved by the Depart-

ment of Assessment and Taxation of Multnomah County. The intervenor filed a timely application for cancellation for the allowable second consecutive year, 1970-1971, and this was subsequently approved with respect to the unfinished "pellet plant" and an office building but the rest of the facility was held taxable by the county's Department of Assessment and Taxation and was assessed at a true cash value of $8,000,000. Intervenor's petition to the Department of Revenue for relief resulted in the exemption order referred to above; an appeal has been made to this court by Multnomah County.

In appealing to this court, the county relied solely upon the testimony of its chief industrial appraiser (who has had much experience in appraising industrial properties but who admitted as a witness that he was not a "technical man," having no formal training in chemical engineering or metallurgy). The witness testified that his recommendation to assess had been based chiefly upon two matters: a story in a local commercial newspaper, dated December 10, 1969, that "[t]he world's first full-scale metallized pellet plant had started production in Portland's Rivergate Industrial District," and by his knowledge that in 1969 some tons of the iron pellets produced in the plant's furnace had been sold to and used by Oregon Steel Mills (a division of Gilmore Steel Corporation) at its new plant on a site adjacent to the intervenor's plant site. In his opinion, this evidence justified taxing the property under the rule of *Allen v. Dept of Rev., supra.*

The court finds that the intervenor had developed a background of technical experience in learning to reduce iron ores from Minnesota to economically usable iron, achieving a continuous flow of the raw material

through specially designed furnaces and converting the ore into a product acceptable in the market. It undertook to reach a similar result in converting Peruvian iron ores, reduced and shipped to the United States in the form of a slurry, seeking an end product consisting of 95 percent pure iron in pellet form. After study, a model was constructed in its laboratories in Toledo, Ohio, proving the correctness of its hypotheses and demonstrating the feasibility of its process.

Following demonstrated laboratory proof of its ability to process the slurry, the intervenor and Gilmore Steel Corporation entered into an agreement, requiring Gilmore to build a steel mill in Portland, Oregon, using electric-arc furnaces for converting to steel the iron pellets to be supplied by intervenor's proposed plant. The two plants were to be located in Portland on adjoining sites to permit the use of a conveyor system to carry intervenor's product directly to Oregon Steel Mills' furnaces.

Construction was begun by intervenor in Portland in February 1968 of the industrial complex which was to include a slurry pond, thickener tank, oxide pellet plant, multitube furnaces, pellet storage silos, and conveyors from the storage to the steel mill's furnaces, together with scrubbers, recuperators, metallizing furnaces, necessary controls, and office space.

The process involved drying the slurry to about 10 percent moisture, after which it was made into an oxide pellet. The unique part of the process was the subsequent removal of the oxygen from the iron oxide, ending up with a metallized pellet to be refined into steel in electric-arc furnaces. The Portland plant was a prototype; prior to its construction, the gaseous re-

duction of iron oxide on a commercial basis had never been attempted.

The product of the pilot plant in the Toledo laboratory had convinced Gilmore Steel Corporation of the utility of the process. However, when intervenor's Portland structure was in place, with a gas reformer 120 times the size of the laboratory model and a metallizing furnace 64 times the size of the pilot plant furnace, a number of serious difficulties were encountered which had never arisen in the Toledo laboratory tests. For example, there was a release of hydrogen sulfide which had a negative effect upon the metallizing process by "poisoning" the catalyst in the gas reformer, with a gradual reduction of an essential catalytic function which was finally cured in January 1970 by closing down one of the two furnaces so that both reformers could be used with one furnace (involving reconstruction at a cost of $500,000). Simultaneously, there was a clustering of the metallized pellets, prohibiting the constant flow which was one of the essential economic features of the process, since the clusters jammed and choked the furnace, requiring its shutdown and the elimination of the jam through mechanical force. This problem was resolved in October 1969. A third, vital problem was the high carbon content of the pellets produced, resulting in a commercially unacceptable product, and this was not resolved until March 12, 1971. A fourth problem was the excessive dust and "fines" generated by the process in the prototype, creating many problems in production and much waste in derogation of commercial feasibility. This was resolved in 1970 upon the expenditure of another $500,000 on a new screening plant, dust collection equipment, and briquetting. (A witness testified that at the present time, 25 percent of the final product is delivered in

briquette form; this was never contemplated or necessary in the laboratory and caused delay while necessary machinery was obtained, installed and tested, since the dust and fines upset the total operation.) In addition to the foregoing, these various inbalances created side reactions and interactions in the furnaces, causing localized overheating, affecting the chemical processes in changing the oxide pellets into acceptable material.

In intervenor's contracts with Gilmore Steel Corporation, there was a minimum production of iron pellets in the amount of 200,000 long tons a year guaranteed, with a plant designed to produce 400,000 long tons a year. Gilmore's plant was completed ahead of the test runs of the intervenor and Gilmore constantly tested the product, seeking to get into the production of steel on its own behalf. Over a two-year period (1969 and 1970), 22,100 tons of the pellets were delivered to Gilmore by intervenor and Gilmore was billed for $353,000. None of the product was commercially acceptable (some actually caused a destructive explosion in Gilmore's electric-arc furnaces) and presently Gilmore refused further deliveries and temporarily changed its plant to the use of scrap metal, obtained from third parties. (Disputes still continue as to the propriety of intervenor's billings to Gilmore.) It was only in the latter part of 1970 and early 1971 that the prototype began to work (at low capacity) and, in March 1971, intervenor was able to obtain an acceptable carbon level (less than 2 percent) in the pellets. In the spring of 1971, a major change was made in the cooling zone of the furnaces which was found to be effective and Gilmore began to accept deliveries of pellets. In the summer of 1971, the intervenor found that it was getting an inconsistent product, due to in-

ability to meter gases in and out of the furnace but by September 1971 had finally attained a stable product, although production has not reached expected levels.

█ The court finds that the improvements on the subject property constituted a structure, all components of which were essential for the production of a specific substance obtained from another substance through chemical change and each part of the improvement was useless unless it and all the other parts were capable of being operated for the purposes of production, and the plant could not be used for the production of any other product. *Collier Carbon v. Dept. of Rev., supra.*

The plant was not in production on January 1, 1970. It is true that the plant produced a substantial tonnage of iron pellets which were sold to Gilmore Steel Corporation's Oregon Steel Mills but this material did not meet commercial standards and was used by the purchaser only for trial runs which proved to be disastrous, for the most part. The case is thus differentiated from *Allen v. Dept. of Rev., supra,* where the lumber mill was producing standard lumber products which were commercially acceptable, although in insufficient quantities to obtain a profit.

The Department of Revenue's Order No. VL 72-97 is affirmed.