## PHILIPS INDUSTRIES OF OREGON, INC. *v.* DEPARTMENT OF REVENUE

John R. Hay and Michael M. Morgan, Davies, Biggs, Strayer, Stoel and Boley, Portland, represented plaintiff.

Glen V. Sorensen, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered March 18, 1974.

CARLISLE B. ROBERTS, Judge.

The plaintiff appealed from the Department of Revenue's Order No. VL 72-376 (dated March 6, 1973). The defendant's order held that the plaintiff's improved property, described as Tax Lot 1, Sec 9, T 9, R 1 W, Marion County, Oregon, near the City of Stayton, did not qualify for exemption from real and per-

sonal property taxes on January 1, 1970, under the provisions of ORS 307.330 and 307.340 ("Commercial Facilities Under Construction").

The applicable statute, ORS 307.330, as pertinent to this suit, provides:

"(1) * * * each new building or structure * * * is exempt from taxation for each year of not more than two consecutive years if the building, structure or addition:

"(a) Is in the process of construction on January 1;

"(b) Is not in use or occupancy on January 1;

"(c) Has not been in use or occupancy at any time prior to such January 1 date;

"(d) Is being constructed in furtherance of the production of income; and

"* * * * *

"(2) If the property otherwise qualifies for exemption under this section and ORS 307.340, the exemption shall likewise apply to any machinery or equipment located at the construction site which is or will be installed in or affixed to such building, structure or addition."

It has been stipulated by the parties that:

"1. Plaintiff at all times pertinent to this litigation was and is engaged in the business of manufacturing and selling component parts for mobile homes. Prior to the commencement of the manufacturing activities in the structure which is the subject of this controversy, plaintiff had not engaged in manufacturing activities in the State of Oregon. Its activities within the State prior to that time related to the storage and sale of products manufactured outside the State of Oregon.

"2. On or about August 15, 1969, plaintiff entered into a contract with CPS Construction Company, Inc. of Lebanon, Oregon to construct a build-

ing upon Tax Lot 1, S9, T9, R1W, Marion County, Oregon near the city of Stayton, Oregon. At all times the plaintiff intended to use the building as a manufacturing facility and has done so since the manufacturing machinery was installed therein."

The improvements upon the property as of January 1, 1970, consisted chiefly of a building and some special-purpose machinery and office machinery. The building itself was of standard construction, fabricated of metal, standing on a concrete base, containing 186,000 square feet, usable for many, widely varied commercial purposes.

Although construction of the building was begun only in September 1969, the standard design and the nature of the materials were such that construction work of the building proper was substantially completed as of January 1, 1970. A sprinkler system and overhead waterlines to supply the system had not been installed. Essential stationary overhead electrical lines and some stationary overhead air lines were in process of installation. Drop lines to the machines awaited the positioning of the machines on the floor. The main bus duct for carrying electricity throughout the building was being worked on as of January 1, 1970. Since the plaintiff's business is the manufacture and sale of component parts for mobile homes and the purpose for erecting the building was to use it as a manufacturing facility, a substantial amount of work remained to be done on January 1, 1970, to make it possible to operate the plant for the intended purposes of an industrial facility.

The building is in the form of a square, with a small extrusion on the west side for the general office. Except for the office space, the southern half of the building is

designated as "Plant 28," intended to be used for the production of doors and windows of mobile homes.

Of the northern half of the building, the westerly two-fifths, approximately, is designed for storage, reception, and shipping of inventory and is designated as a warehouse area. The easterly three-fifths of the northern half is designated as "Plant 29," and is designed to produce venting equipment, such as fans and range hoods, sidewall and roof vents. Plant 28 is a production line, converting raw materials into finished doors and windows, utilizing cutters, riveters and presses, requiring electrical and pneumatic power. Plant 29 involves the use of heavy presses, cutters and riveters, and was designed to include a paint booth and oven. Raw materials are moved to the machines by overhead cranes and, in Plant 29, a monorail conveyor is used to move components, particularly through the paint booth and the oven.

Only a small portion of the machinery necessary to complete a finished product in Plant 28 was installed as of January 1, 1970. These machines were not in their final location and some were not bolted to the floor. Some raw material (extruded aluminum lengths) was stored nearby but Plant 28 did not produce a finished door or window until approximately mid-January and was not actually "in production" until mid-February of 1970. As of the assessment date, it was incapable of producing a finished product because it lacked the necessary machinery, the overhead crane, and the stationary overhead air and electrical lines and movable drop cords necessary to power the machines.

Plant 29 was intended to use approximately 50 machines when in full production. As of the assessment date, four machines were in place, including only one

or two of the necessary 10 machines required to produce any product for which Plant 29 was intended. Approximately 30 construction workers were engaged in necessary tasks in the building as of January 1, 1970. Prior to that date, some finished goods were moved from a leased warehouse in Silverton and stored in the warehouse area, possibly occupying as much as 2,000 square feet. Some finished range hoods and venting material from Indiana occupied another 1,000 square feet. The office area had been used to hire personnel and to install time procedures, five people being employed. Accounting procedures were developed at the home office. The accounting and office procedures were not "finalized" as of the assessment date but were being utilized.

Plant 28, prior to January 1, 1970, was used for a supervised training program on small metal cutters and presses, the first production employees being hired on December 29, 1969. There were six or seven of these employees; they did not produce a finished product; they were the only production employees in the building; this training program used about 5,000 square feet of Plant 28.

Four people were employed in Plant 29 as of January 1, 1970, two of the four being used to spot and install machinery and in preparing to establish and run a vent line. Two were building assembly tables, painting lines on the floor, installing fire extinguishers and doing other acts preparatory to production.

It is the defendant's view that the plaintiff's building was not under construction on January 1, 1970, since all the basic functional and substantially necessary elements of the building had been completed, and the building had been used prior to January 1 and was

being used and occupied on January 1. Defendant argues that it is not necessary that the machinery necessary for production be installed before a building is completed and that the intent of the owner as to what the building is to be used for is not important in the determination of whether a building is completed.

As the court noted in *Collier Carbon v. Dept. of Rev.*, 5 OTR 1 (1972): "It is recognized that cases of the kind considered here will give rise to every possible difference in degree, and the tax administrator's task is a difficult one." The administrator is aware of the dangers of tax avoidance, but there is no suggestion of that problem in this suit.

The facts in the present suit are easily distinguishable from *Collier Carbon, supra,* and from the case of *Multnomah County v. Dept. of Rev.* (Midland-Ross Corporation, Intervenor), 5 OTR 437 (1974). In both of those cases, the property improvements in issue (apart from office buildings) consisted of an industrial complex in which there was no standard building which could be utilized for many purposes but, on the contrary, involved a complex structure of several units, each of which was useless without the other, and the whole was designed for the handling or production of a single product, not being adaptable for any other purpose. In those circumstances, the court held that, since an essential part of the total structure was under construction on the assessment date, the whole structure was exempt.

The present suit is also distinguishable from *Allen v. Dept. of Rev.* (Blue Mt. Forest Products, Inc., Intervenor), 5 OTR 185 (1973). The court found in that case that the basic functional and substan-

tially necessary elements of the specific structure, a sawmill, had been completed to the extent that actual production and sale of finished materials, designed for the market and of marketable quality, had occurred before the assessment date (although greater efficiency was required before a profitable enterprise could be realized). The property was therefore taxable.

The situation here presented differs from the facts in the cases cited and is probably more typical of industrial enterprises than the special structures involved in those cases, inasmuch as the plant involves a standard building and the importation and installation of a number of special machines which, with minor effort, could be replaced by another group of machines designed for a totally different purpose. What criteria did the legislature intend for use in determining whether the statutory exemption is applicable to such conventional facilities under the facts of this suit? Is it possible to develop from the statute an administratively feasible rule for the use of assessors in these cases?

A second, subordinate issue appears in the present suit: Is it possible to treat a part of the property as being used and occupied on January 1, and therefore subject to taxation, and another part as not in use or occupancy and therefore tax exempt?

The rule in the cases cited above is that a specialized structure is exempt as "under construction" until it is able to produce marketably acceptable items or units of the product for which it was designed and intended (but not for more than two consecutive years). Should the county assessor expect to treat differently the specialized, industrial single-purpose complex found in *Collier Carbon, supra,* and *Multnomah County*

(Midland-Ross), *supra,* and the general purpose building (as in the present case) which is suitable for numerous commercial and industrial activities, and to which the basic functional and necessary elements *as a building* have been completed as of the assessment date?

The court, in construing the statute, must begin with the well-established rule that a tax exemption statute is subject to a "strict but reasonable construction." *Mult. School of Bible v. Mult. Co.,* 218 Or 19, 27, 343 P2d 893 (1959) ; see also cases cited in *Emanuel Lutheran Char. v. Dept. of Rev.,* 4 OTR 410, 416 (1971). The legislative intent must be formulated from the language used in ORS 307.330.

A reading of the statute shows it to be an inducement to stimulate investment of capital by the taxpayer in new industrial, commercial or personal service ventures in Oregon (or the enlargement thereof through additions) which necessarily utilize real and personal property which is ordinarily subject to ad valorem taxation. The exemption is linked to those activities which are "in furtherance of the production of income." Implicit in the statute is the notion that the tax exemption is allowable only during that period (or two consecutive years thereof) during which the undertaking is unable to produce that income which, eventually, the entrepreneur expects to use to pay expenses, including the property taxes, and to make a profit.

The statutory phrases "in process of construction" and "in use or occupancy," obviously are not terms applicable to the building contractor and his employees (even if the entrepreneur is his own contractor). The terms must relate to the activities of the entrepreneur directly related to the income-producing activity.

It follows that the intent of the developer of the property is significant to the assessor in the latter's application of the statutory language on January 1, the assessment day. For example, an agent engaged only in personal services may choose to move into an unfinished suite of offices (constructed on his order), bringing with him a desk, chair and filing cabinet, have a telephone installed, and immediately engage in the production of business, although it is anticipated that papering, painting, installation of light fixtures, and numerous other constructional details will eventually take place. In another instance, a person may have constructed a large office building with the intention of leasing suites, his income being dependent upon rentals, his intended market being businesses which would undertake to finish according to their wishes the building shell provided by the lessor. In both these instances, the assessor could be justified in placing on the assessment roll the structures which were physically incomplete. On the other hand, a lessor of motel rooms to transients on a day-to-day basis could not be expected to be in operation except with respect to those rooms and suites which were completely rentable (including the usual amenities) as of the assessment date.

The defendant has cited the case of *Texas Eastern Transmission Corp. v. East Amwell Tp.*, 82 NJ Super 593, 198 A2d 786 (1964), to sustain the proposition that the intent of the owner as to the use of a building is not important in the determination of whether a building is completed. In that case, a gas transmission line, running approximately 44 miles in the State of Delaware, contained a seven-mile portion in the Township of East Amwell. As of the assessment date, the line had been fully laid and backfilled in East Amwell but not in the state as a whole. In addition to laying and

backfilling, before that section of the pipeline lying in the taxing jurisdiction could actually be used for transporting gas, it was necessary to make a hydrostatic test, to remove the water used in such testing, to clean and dry the pipe by running scrapers through it, and to complete the drying process by running gas through the pipe. As a matter of fact, it was more convenient to the owner to take care of this process on the entire 41-mile section between pumping stations (and this work, in fact, was done within a space of eight days after the whole line was completed two months later). The assessment statute provided that such an improvement could be placed on the tax rolls when it was "completed" and the statute defined that term as meaning "substantially ready for the use for which it was intended." The court held that the portion of the line in East Amwell was physically completed by October 1 to the degree that it was substantially ready to be incorporated into the line as a whole when the latter should be ready and "this is all that is required to meet the intent of the statute in respect of the assessability of the portion of the line situate in the taxing district of East Amwell." The pertinent statute in the case cited and that which is being construed in the present suit are so different that the case can be distinguished on that ground alone and is of no aid in resolving the present question.

Another point which has been raised by the defendant relates to the provision in ORS 307.330 (2) which provides that if the property otherwise qualifies for exemption, "the exemption shall likewise apply to any machinery or equipment located at the construction site which is or will be installed in or affixed to such building, structure or addition." This is cited for the proposition that it is not necessary that the machinery

required for production be installed before a building is completed. The language does suggest that the completion of a building is the more significant aspect as between the exemption of real property or fixtures but, in a statute which must be strictly construed, it is imperative that the legislature take notice of the unattached fixtures, specifying whether any exemption was to be accorded to them during what might be a long period of construction. It appears to the court that this subsection strengthens rather than weakens the concept that the building or structure must be operable for the purposes of income production, rather than otherwise.

■ The court finds that some of the arguments made by defendant in the present suit are contrary to its own promulgated regulation, R307.330.2.d. That regulation reads:

> "No exemption may be allowed if use or occupancy is made of the building, structure or addition, or any part thereof, on or before January 1 of any calendar year in which the exemption is claimed. Use or occupancy refers to that use or occupancy for which the building is intended upon completion. For example, the use of a warehouse for storage of materials or the rental of an apartment in a new apartment building will defeat the exemption. Testing of equipment preparatory to operation is allowable during the period of construction."

Upon amending the regulation for promulgation in Oregon Administrative Rules on April 1, 1972, the defendant, in OAR 150-307.330.2.d., added:

> " 'Testing' can include a limited trial production run as a check of equipment and system performance. 'Testing' in the context used does not contemplate the processing in substantial quantity of

finished and marketable products that are or can be disposed of through the usual channels of trade."

The second sentence of regulation, R307.330.2.d., appears to be a recognition of the significance of the intent of the entrepreneur in determining whether use or occupancy has occurred, in the same sense suggested above by this court. The reference to "testing" appears to be a recognition of the concept that there can be no use or occupancy unless the intended use of the building is being made through the installation of machinery essential to that intent. This regulation has been in effect since 1965. A court takes judicial notice of the administrative interpretation of tax statutes by the tax administrator. While such interpretations are not controlling, their contemporaneous construction of an act is highly persuasive, especially where such rules have been in effect for a long period of time as a basis for determining technical and involved matters such as here presented. *Keyes v. Chambers et al*, 209 Or 640, 661, 307 P2d 498 (1957). The plaintiff had not been able to make even a limited trial production run of its machinery as of the assessment date.

A second question has been mentioned; viz., whether or not a rule of severability is applicable to the buildings and structures coming under ORS 307.330. In the quotation from the defendant's promulgated rules, set out above, there is ambiguity in the first sentence; the construction to be given to the words "or any part thereof" is not clear to the court. In the present case, one situation which raises the question is the use of up to 3,000 square feet of the approximately 35,100 square feet in the warehouse to store inventory which was formerly stored in a rented warehouse. Some saving has been accomplished by the transfer of this inventory to the new building. Some of these finished

goods were shipped to customers before the assessment date. While the amount involved may be regarded as de minimis, in view of the strict construction to be given to tax exemptions, it must be recognized that the space intended for a warehouse and shipping office was being used as such on the assessment day and it was therefore taxable. The court finds the warehousing function to be severable from the manufacturing function, in use and occupation by the entrepreneur on the assessment date and, therefore, taxable.

A second situation, subject to the same principle, was the general office space, utilizing approximately 2,000 square feet. As of January 1, 1970, it had been occupied and used for hiring personnel, purchasing of raw material for use in product manufacture, and the maintenance of accounts payable and payroll.

The fact that these areas were not fully or efficiently used is not significant. *Allen v. Dept. of Rev., supra.*

The defendant's Order No. VL 72-376 is set aside, the plaintiff's building and machinery and equipment contained therein are declared exempt from the property tax for the tax year 1970-1971, pursuant to ORS 307.330, except as to the entire warehouse space and the entire general office space.

Inasmuch as the question presented to the court is regarded by it as novel, each party shall bear its own costs.